**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CRAIG ALAN PIERI,

      Plaintiff,

v.                                      No. CV 11-1054 RB/CG

CORRECTIONAL MEDICAL SERVICES,
WILLIAM SHANNON--MD,
LEOPOLD RASCHBAUM--MD,
DR. FARRIS,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on *Defendant Correctional Medical Services, William Shannon, M.D., Leopold Raschbaum, M.D., and Bud E. Faris, D.O.'s Martinez Report*, (Doc. 35), *Plaintiff's Response to Martinez Report*, (Doc. 39), and *Defendant Correctional Medical Services, William Shannon, M.D., Leopold Raschbaum, M.D., and Bud E. Faris, D.O.'s Reply in Support of Martinez Report*. (Doc. 44). Plaintiff Craig Alan Pieri alleges that Defendants violated his constitutional rights by failing to provide adequate medical care during his incarceration at various correctional facilities in New Mexico. (*See, generally*, Doc. 10 at 1-8). Defendants claim that they provided Plaintiff with adequate medical care at all times and request that the Court grant summary judgment in their favor on all claims. (Doc. 35 at 1, 26-29). The Court, having considered the parties' filings, the relevant law, and otherwise being fully advised in the premises, **RECOMMENDS** that summary judgment be granted in favor of Defendants and that Plaintiff's amended *Civil Rights Complaint*, (Doc. 10), be **DISMISSED WITH PREJUDICE**.

## I.   Background

### a.   Plaintiff's Allegations

Plaintiff is a prisoner who has been incarcerated in several New Mexico penal institutions over the last two years, including the Penitentiary of New Mexico ("PNM"), the Southern New Mexico Correctional Facility ("SNMCF"), and the Northeast New Mexico Detention Facility, ("NENMDF"). (Doc. 35 at 5, 15, 17, 19). Plaintiff claims that Drs. Shannon, Raschbaum, and Faris failed to provide him with necessary medical care while he was incarcerated at those three institutions, respectively. (Doc. 4 at 1-3; Doc. 10 at 1-8).

Plaintiff filed his original complaint in the First Judicial District Court for the District of New Mexico. (Doc. 1 at 1; Doc. 4 at 1-3). Plaintiff generally alleged that Defendants were not properly treating his seizure disorder and they were replacing "effective" medications with less effective ones, such as Valproic Acid. (Doc. 4 at 2).[1] He also alleged that prescription medications were not refilled in a timely manner and that Defendants had not treated physical wounds suffered during seizure episodes. (*Id.*).

Defendants removed the case to Federal Court and Plaintiff subsequently filed an amended complaint. (Doc. 10). The amended complaint is difficult to follow in that it alleges generalized complaints of medical neglect interspersed with specific allegations against the individual defendants. For example, he alleges that Dr. Raschbaum, a doctor as SNMCF, failed to treat multiple seizures and that these seizures resulted in head injuries. (*Id.* at 3). The seizure injuries purportedly resulted in infections which were not treated. (*Id.* at 4). He

---

[1]  Valproic Acid is an anti-convulsant that is used to treat certain types of seizures disorders. It is also used to treat mania caused by bipolar disorder and to prevent migraine headaches. *See,* United States National Library of Medicine*, available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/.

also complains that he was given Valproic Acid even though the medication was supposed to have been discontinued. (*Id.* at 3). He alleges that the Valproic Acid was given "in a corosive [sic] manner" and that the medication caused damage to Plaintiff's stomach and throat. (*Id.*)

Defendant Correctional Medical Services, the company responsible for providing medical care at the three institutions, is accused of adopting a policy of eliminating the prescription of "effective" medications in favor of non-effective ones. (*Id.* at 3). Plaintiff points to Valproic Acid, Ibuprofen, and Acetaminophen as examples of less effective medications that he received. (*Id.*). He also generally claims that medical staff did not reorder prescription medications in a timely fashion and that he sometimes receives the incorrect medication. (*Ia.* at 5-6).

Plaintiff alleges that Defendant Shannon, a doctor at PNM, deliberately discontinued Plaintiff's pain medication "for the purpose of having this Plaintiff transferred to a G.E.O. private prison." (*Id.* at 4). He argues that blood work and "chronic care appointments" were not followed up on while he was under Dr. Shannon's care. (*Id.*).

Plaintiff alleges that Dr. Faris, a doctor at NENMDF, refused to provide him with anti-seizure medication and high blood pressure medication unless Plaintiff would agree to take Valproic Acid. (*Id.* at 4). Plaintiff again claims that the Valproic Acid was a "corosive [sic] material" and that he did not want to take it because it damaged his throat and stomach. (*Id.*). As a result, Plaintiff was "left to suffer with seizures, extreme amounts of pain and acid indigestion." (*Id.*).

Plaintiff claims that Defendants' deliberate indifference to his serious medical needs violated his constitutional rights under the Eighth and Fourteenth Amendments. (*Id.* at 2-3,

3

6). He requests declaratory, injunctive, and monetary relief. (*Id.* at 8).

### b.   Martinez Report

The Court ordered Defendants to prepare a comprehensive *Martinez Report* addressing Plaintiff's allegations. (Doc. 33). Defendants filed their *Martinez Report* in June, 2012, and asked that the Court construe it as their motion for summary judgment. (*Id.* at 1). The *Report* contains voluminous medical records documenting Plaintiff's treatment at PNM, SNMCF, and NENMDF

The medical records in the *Martinez Report* cover the period between October, 2010, until November, 2011. (Doc. 35, Ex. A at 1-7). During that time, Plaintiff was primarily incarcerated at PNM. However, he was incarcerated at SNMCF from November 16, 2010, until April 20, 2011 and at NENMDF from April 29, 2011, until June 2, 2011. (Doc. 35 at 5, 15, 17, 19). Contrary to Plaintiff's allegations, the medical records contained in the *Martinez Report* suggest that he has received frequent medical attention for his various maladies. For example, the records reflect that he was seen by either a doctor or nurse practitioner regarding his seizure condition or some other medical complaint five times between October 10, 2011, and December 31, 2011. (Doc. 35, Ex. A, Bates stamp at 6, 13, 18-19, 23, 30).[2] He met with a doctor or nurse at least sixteen times in 2011 to receive care for his conditions. (*Id.* at 40-41, 43-45, 47, 54, 71, 73-75, 77, 79-80, 83, 89, 94-96, 107). In addition, Plaintiff received care at the "Chronic Clinic" at least five times between October 2010 and November 2011. (*Id.* at 10-11, 35-36, 48-49, 108-09, 117-118). He received

---

[2] The medical records produced by Defendants are numbered using Bates stamps, as required by this Court's Order for a *Martinez Report.* (Doc. 35, Ex. A; Doc. 33 at 4). For ease of review, the Court will cite to the Bates stamp for the applicable document when citing to Plaintiff's medical records.

substantial mental health counseling as well - the records reflect at least twelve mental health evaluations and care by a number of psychiatrists in the various institutions. (*Id.* at 24, 26, 29, 42, 50, 58, 70, 76, 84, 90, 110, 116). Laboratory tests were ordered several times to check on the nature or progress of Plaintiff's medical complaints and his blood was drawn to check medication levels several times during that period. (*Id.* at 14-15, 18-19, 87, 91-93, 104, 108-109, 112-113).

While the records indicate that Plaintiff received frequent medical care for his various injuries or conditions, they also reflect complaints on Plaintiff's part regarding his doctors' choice of drugs or their treatment plans. Multiple treating sources diagnosed him with a seizure disorder and he was frequently prescribed Valproic Acid, Phenobarbital, and Neurontin to treat the disorder. (*See, e.g.*, *Id.* at 6, 22, 31, 63, 72, 86, 95, 107).[3] Plaintiff found that the Valproic Acid upset his stomach and Plaintiff refused to take the medication on a number of occasions. (*Id.* at 34, 36, 64, 68, 103).  Plaintiff also complained that his anti-seizure medications were not delivered or that the dosage was wrong and that these failures led to seizure episodes. (*Id.* at 18, 40, 74, 79). Plaintiff suffered several abrasions and injuries after falling during a seizure and it appears that these wounds were treated by medical personnel. (*Id.* at 15, 18, 40, 54, 59). Plaintiff was frequently prescribed Bactrim, an antibiotic, to combat any potential infection caused by the wounds. (*Id.* at 44, 51, 54, 59, 63, 73, 118).

Plaintiff's records reflect intermittent complaints of pain either from migraine

---

[3] The medical records reflect prescriptions for Valproic Acid, Depakote, and Depakene. Depakote and Depakene are merely brand names for Valproic Acid. *See,* United States National Library of Medicine*, available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/.

headaches brought on by seizures or severe muscle pains due to unspecified conditions. Plaintiff was prescribed a number of different pain medications which were occasionally discontinued or restarted based on their perceived effectiveness. The medications include Tylenol, Ibuprofen, Pain Off, Excedrin Migraine, Parafon Forte, and Tramadol. (*Id.* at 6, 22, 31, 40, 47, 63, 71-73, 79, 82, 87, 95, 104, 106-07). Again, the records reflect displeasure on Plaintiff's part regarding the doctor's choice of pain medications. (*Id.* at 35, 74, 98). He specifically complained that doctors were prescribing  Tylenol or Ibuprofen as he felt that more powerful medications were necessary. (*Id.* at 74, 98).

Based on those records, Defendants submit that Plaintiff received comprehensive treatment for his medical conditions while incarcerated in New Mexico and that his claims should be dismissed. (Doc. 35 at 26-29).

### c.   Plaintiff's Response to *Martinez Report*

Plaintiff filed his response to the *Martinez Report* on July 26, 2012. (Doc. 39). The response is over one hundred pages long and he argues that the *Martinez Report* shows that Defendants deliberately ignored his serious medical condition. (Doc. 39 at 7). He argues that, prior to being incarcerated in the New Mexico penal system in 2005, he was receiving medical care and his seizure disorder was under control (Doc. 39-2 at 23). Since his incarceration, his medications have been changed for what he perceives to be less effective alternatives. (*Id.* at 23-25). The same holds true for his pain management - he argues that his pain was well controlled by narcotics and that the gradual regression to less effective types of pain medication has caused him unnecessary pain. (*Ia.* at 23-25).

He repeats his allegations that he was not always provided with the correct medication or the full dosage of anti-seizure medications and that he was forced to take

6

Valproic Acid even after he requested that it be discontinued due to negative side effects. (*Id.* at 9, 11, 15-17; Doc. 39-2 at 19, 21). While at NENMDF, he was purportedly told that he would not receive any other medications unless he took the Valproic Acid, which he claims was being dispensed "in a corosive [sic] manner." (Doc. 39 at 28-29, 31; Doc. 39-2 at 21). He also raises a new complaint which was not mentioned in his complaint or amended complaint. He claims that Defendants violated his constitutional right by keeping him in segregation for over two years during his confinement. (Doc. 39-2 at 30). He claims that this isolation exacerbated his post-traumatic stress disorder and anxiety. (*Id.* at 30-31).

## II.   Standard of Review

In the Court's Order directing submission of a *Martinez* Report, the parties were advised, pursuant to *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991), that their submissions could be used in deciding whether to grant summary judgment. (Doc. 33 at 2). Defendants have requested that the Court construe their *Martinez Report* as a motion for summary judgment and the Court finds it appropriate to do so.

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" FED. R. CIV. P. 56(c)(2). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49

7

(1986). Affidavits or other evidence offered by the nonmoving party must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmoving party. Although all facts are construed in favor of the nonmoving party, it is still Plaintiff's responsibility to "'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to [his] case' in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *Celotex,* 477 U.S. at 322).

The Court liberally construes Plaintiff's filings because he is proceeding *pro se*. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Nevertheless, a *pro se* non-moving party must still "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hospital,* 221F.3d 1160,1164 (10th Cir. 2000). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion. Additionally, in a summary judgment posture, the verified Complaint and the *Martinez* Report may be treated as affidavits. *Hall,* 935 F.2d at 1111.

**III.   Analysis**

Plaintiff argues in his amended complaint and his response to Defendants' *Martinez Report* that Defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights under the Eighth and Fourteenth Amendments. Plaintiff's response to the *Martinez Report* is voluminous and describes in great detail perceived failures by Defendants personally or other unnamed medical staff to treat his numerous medical conditions. The Court will endeavor to identify all of Plaintiff's complaints and determine whether the named Defendants are entitled to summary judgment on those claims.

### a.   Plaintiff's Fourteenth Amendment Claims Should be Dismissed

As noted, Plaintiff claims that Defendants' failure to treat his medical conditions violated his rights under the Eighth and Fourteenth Amendment. (Doc. 10 at 2-3). The Tenth Circuit has long held that, where a prisoner asserts that prison officials have been deliberately indifferent to an inmate's medical needs, the Court should review those claims under the Eighth Amendment, and not the Fourteenth Amendment. *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996) (noting that, when a prisoner asserts claims under the Eighth and Fourteenth Amendment due to inadequate medical care, the Court should review the claims solely under the Eighth Amendment); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment . . . must be the guide for analyzing these claims.") (citations and quotations omitted).

Notwithstanding a brief reference to the equal protection clause of the Fourteenth Amendment, it is clear that Plaintiff's claims are rooted in the Eighth Amendment's prohibition against cruel and unusual punishment in the provision of medical treatment to incarcerated prisoners. He alleges that the Defendants failed to provide him with adequate or timely medical treatment and that these failures constitute "crewl [sic] and unusual punishment." (Doc. 10 at 3-5). He also repeatedly invokes the "deliberate indifference" standard, which is used to determine whether a defendant has violated a prisoner's Eighth Amendment right to adequate medical care. (*Id.* at 4); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). His legal citations are all to Eighth Amendment cases. (*See, e.g.*, Doc. 39-2 at 26-27). Because Plaintiff's claims arise solely under the Eighth Amendment, the Court recommends that summary judgment be granted on his Fourteenth Amendment claims.

9

b.   **Law Relating to Eighth Amendment**

Plaintiff's allegations largely result from Defendants' purported inability to treat his seizure and pain disorders and their attendant symptoms. He contends that this mistreatment constitutes cruel and unusual punishment under the Eighth Amendment and that he is entitled to relief.

To succeed on his Eighth Amendment claim, Plaintiff must establish that Defendant acted with "deliberate indifference to [his] serious medical needs," *Estelle v. Gamble*, 429 at 104. Prisoners are forced to rely on prison authorities to access medical care, and so prison authorities have an affirmative obligation to provide adequate medical care to inmates. *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980). Because of that duty, inadequate, delayed or denied medical treatment may constitute a violation of the prisoner's Eighth Amendment rights. *Estelle*, 429 U.S. at 103. However, a mere "complaint that a prison physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106. Rather, Plaintiff must show that the Defendants exhibited deliberate indifference to his serious medical needs. *Ramos*, 83 F.3d at 575 (citing *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978)).

To show that prison officials were deliberately indifferent to his serious medical needs, Plaintiff must establish both the objective and subjective components of his Eighth Amendment claim. The objective component of a 'deliberate indifference' claim is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

10

recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted). To prevail on the subjective component, Plaintiff must show "that the Defendants knew he faced a substantial risk of harm and disregarded that risk . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (internal citations omitted).

### c. Prescriptions for Valproic Acid

One of Plaintiff's central complaints is that he was forced to take Valproic Acid to treat his seizure disorder. Plaintiff relates that when he was first incarcerated in New Mexico, his seizures were well controlled by taking Phenobarbital and Diazepam. (Doc. 39-2 at 16). The Diazepam was not prescribed because it is not an approved medication in New Mexico Correctional facilities. Instead, Plaintiff was given Valproic Acid in combination with the Phenobarbital to treat his seizures. (*Id.* at 16-17). The new drugs did not work as well and he began experiencing seizures more frequently. (*Id.* at 17). Plaintiff was frequently prescribed Valproic Acid even though he felt that Neurontin, which was initially prescribed at SNMCF, was more effective. (*Id.* at 18-21, 23-24 (stating that Valproic Acid was "a far less effective medication" and that the combination of Neurontin and Phenobarbital "have proved to be effective in controlling Plaintiff's seizures . . .")). He contends that the decision to prescribe a less effective medication violates his Eighth Amendment right to adequate medical treatment.

Defendants contend that Plaintiff is not entitled to any particular course of treatment while incarcerated and that the doctors at the various correctional facilities were entitled to exercise their independent judgment in prescribing him Valproic Acid. (Doc. 35 at 27-28;

11

Doc. 44 at 3-4; 6-7). The Court concurs.

It is true that the Eighth Amendment creates an obligation on the part of prison officials to provide adequate health care to inmates. *Estelle*, 429 U.S. at 103. However, a a mere "complaint that a prison physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106. Moreover, a "prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir.1999). A prisoner cannot show deliberate indifference by arguing that prison doctors were pursuing a course of treatment which the Plaintiff felt was ineffective or even negligent. *See, e.g.*, *Taylor v. Ortiz*, 410 F. App'x 76 (10th Cir. 2010) (no constitutional violation when doctors chose not to provide plaintiff with a more advanced "combination treatment" for hepatitis C which would have protected plaintiff from liver cirrhosis or cancer); *Johnson v. Standifird*, 400 F. App'x 369, 371 (10th Cir. 2010) (no constitutional violation where orthopedist recommended against surgery to treat degenerative disease in plaintiff's knee and hip until the condition "severely affected the quality of his life.").

In this case, Plaintiff complaint is that Valproic Acid was less effective than other medications such as Diazepam or Neurontin. His argument that Defendants should have prescribed those drugs instead of Valproic Acid amounts to a mere disagreement with the doctors' diagnosis or prescribed course of treatment. The Tenth Circuit has repeatedly held that this is insufficient to establish a violation of the Eighth Amendment. *Perkins*, 165 F.3d at 811.

Plaintiff also alleges that the prescription of Valproic Acid was improper because he

continued to receive it even after Dr. Raschbaum at SNMCF had discontinued the drug after his arrival at SNMCF (Doc. 39-2 at 19 (stating that Dr. Raschbaum discontinued Valproic Acid in favor of Neurontin but that unnamed medical staff reordered Valproic Acid nevertheless)). However, even if the Court were to assume that the continued prescription of Valproic Acid by other medical providers after Dr. Raschbaum discontinued the drug amounts to negligent treatment, malpractice or medical negligence is insufficient to establish a constitutional violation. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 2008). Medical providers are not deliberately indifferent when they prescribe medical treatment they believe is warranted, even if it turns out to be contraindicated by other medical decisions. *Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir. 2008); *see also Brown v. Prison Health Services*, 159 F. App'x 840, 840-41 (10th Cir. 2005) (holding that medical personnel did not act with deliberate indifference when they provided an inmate with a diabetes medication even though a note in his medical file indicated he should not be prescribed this type of medication).

Plaintiff also argues that the Valproic Acid was dissolved in water and provided in liquid form at SNMCF and at NENMDF. He claims that the drug was "corrosive" in this form and that being forced to take it in its liquid state caused damage to his throat and stomach. (Doc. 39-2 at 19, 25, 28). While the provision of medicine in an unsafe manner might constitute the "wanton infliction of pain" in violation of the Eighth Amendment, Plaintiff does not claim that either Dr. Raschbaum at SNMCF or Dr. Faris at NENMDF were involved in the decision to mix the medications together in the purportedly unsafe manner. The medical records provided by Defendants indicate that Dr. Faris never treated Plaintiff as his name appears on none of the treatment notes from NENMDF. (Doc. 35 at 28; Doc. 44 at 5-6).

Plaintiff admits that the drug was provided "in a corrosive manner by other *non-doctor (C.M.S.) personnel.*" (Doc. 39-2 at 24) (emphasis added). Plaintiff has not shown that either doctor was responsible for the harmful application of the medication and cannot maintain an action against them. *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."). Neither can he hold either doctor responsible for the negligent acts of subordinate medical employees. *Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) ("[A] supervisory relationship alone is insufficient to establish liability under § 1983"). The Court therefore recommends that Defendants' motion for summary judgment be granted with regard to this claim.

### d.      Failure to Measure Blood Levels

In addition to being prescribed ineffective anti-seizure medications, Plaintiff alleges that Defendants failed to test the medication levels in his blood frequently enough.  He claims that, despite frequent orders by medical personnel to have his levels checked, no blood testing occurred  for eight months between October 2010, and June, 2011. (Doc. 39 at 20-21, 23-24, 35).

Defendants respond that it was prison policy to check blood levels approximately every six months, particularly when the previous lab tests were normal. (*See,* Doc. 35-3 at 60 (prison officials denied Plaintiff's grievance in March of 2011, noting that his previous lab tests were normal and that he would be retested around May of 2011)). Defendants further argue that Plaintiff has not shown that the delay in testing constituted deliberate indifference to Plaintiff's medical needs. (Doc. 44 at 6).

In order to establish a constitutional violation based on the eight month delay

between blood tests, Plaintiff must show that the delay resulted in "substantial harm." *See,*
*e.g.*, *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) ("Delay in medical care
only constitutes an Eighth Amendment violation where the plaintiff can show that the delay
resulted in substantial harm."). The substantial harm test is met if the delay resulted in
"lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman,* 254 F.3d
946, 950 (10th Cir. 2001). In this case, although Plaintiff asserts that his blood levels were
not checked for eight months, he has not identified any injury resulting from this failure
sufficient to establish a violation of his Eighth Amendment rights. Plaintiff admits that the
blood tests from October, 2010, indicated that his medication levels "were within normal
limits." (Doc. 39-2 at 18, 35). He does not state whether the June, 2011, results were
abnormal, though he does claim that Neurontin was not present in his blood because
medical personnel had failed to reorder it in a timely fashion. (*Id.* at 32). Based on these
records, it does not appear that the delay in testing caused him substantial harm or any
lifelong impairment.

At best, Plaintiff argues that more frequent testing would have shown whether the
various anti-seizure medications were being properly metabolized and would have better
established the "bioequivalency" - meaning the combined effectiveness - of the various
drugs. (Doc. 39-2 at 17, 25). He believes that more frequent testing would have enabled
doctors to tailor his medications and create the most effective drug combination for his
particular condition. (*Id.*). This is no more than a claim that prison doctors, who were
admittedly treating his seizure condition, could have done a better job formulating a drug
regimen. As previously noted, a disagreement with prison doctors regarding the best or
most effective course of treatment does not establish a constitutional violation. *Olson v.*

15

*Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993). The Court therefore recommends that summary judgment be granted on this claim.

### e.    Failure to Provide Full Doses of Anti-Seizure Medication

Plaintiff also alleges that he occasionally received an incomplete dose of his anti-seizure medications or that he did not receive them at all. For example, he claims that he did not receive his full dose of anti-seizure medications on two occasions at PNM in October of 2010. (Doc. 39 at 9, 11). He also asserts that he did not receive his medication for three days in January of 2011 while at SNMCF. (Doc. 39-2 at 19). Finally, he claims that several anti-seizure doses were missed during his transfer from SNMCF to PNM in April of 2011. (Doc. 39 at 24, 27). He alleges that he suffered seizures as a result of these missed or incomplete doses.

While intentionally depriving an inmate of necessary medication is a violation of the inmate's Eighth Amendment rights, the medical records show that unidentified nurses or other medical personnel occasionally failed to provide Plaintiff with the appropriate medication. Plaintiff states that nurses brought him incomplete doses at PNM in October of 2010. (*See* Doc. 35, Ex. A, Bates stamp at 18 (complaining that "some mornings the nurse only brings me one pill of [Valproic Acid] when she's supposed to bring two [Valproic Acid] pills."); Doc. 39 at 9 ("Plaintiff explained about incorrect amounts of medication sometimes being delivered to Plaintiff . . . Plaintiff discussed the unwillingness of nurses to return to Plaintiff's housing unit with the missing medications.")). He claims that unnamed personnel made a mistake at SNMCF and gave a different prisoner his anti-seizure medications for several days. (Doc. 39-2 at 19 ("Plaintiff had not gotten his medication for three days. Plaintiff found out later that an inmate named Chris Pierce in a next pod over

16

was receiving Plaintiff's medications by mistake."). Similarly, it appears that his transfer from SNMCF to PNM resulted in him missing several anti-seizure doses even though Dr. Shannon, Plaintiff's treating physician at PNM, reordered Plaintiff's medications upon his arrive at PNM. (Doc. 39 at 24; Doc. 35, Ex. A, Bates stamp at 73 (indicating that Dr. Shannon saw Plaintiff the day after his transfer and reordered Neurontin and Phenobarbital to treat Plaintiff's seizures)).

Plaintiff cannot hold Drs. Shannon, Raschbaum, or Faris responsible for the negligence of other medical employees. *Poolaw*, 565 F.3d at 732. Similarly, Plaintiff has not alleged that Defendant CMS had a policy or practice of providing inmates with the incorrect dose of their prescribed medications. As such, he cannot hold CMS responsible for the acts of negligent medical personnel. *See, e.g.*, *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (noting that entities are only liable under § 1983 if the injury is the direct result of the entity's wrongful policy or custom); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211 (10th Cir. 2007) ("It is true that § 1983 liability for an entity cannot be predicated on respondeat superior"). Therefore, the Court recommends that summary judgment be granted on this claim.

### f.   Delay in Receipt of Medication

Plaintiff also claims that several medications were not renewed in a timely fashion at both SNMCF and PNM. He claims that he ran out of Vistaril, an allergy medication, in February of 2011 and that he did not receive a refill for a week and a half. (Doc. 39 at 20).[4]

---

[4] Vistaril, also known as Hydroxyzine, is used to relieve itching caused by allergies. *See* United states National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000796/

Similarly, he claims that his Excedrin pain medication was not renewed until he complained several times of his prescription running out. (*Id*.). More significantly, he claims that his Neurontin was not timely renewed following his transfer from NENMDF to PNM in June of 2011 and that he suffered serious seizures and injuries as a result of not having the anti-seizure medication. (Doc. 39 at 33; Doc. 39-2 at 21, 28). Defendants have not specifically addressed these allegations except to argue generally that all of the named Defendants treated Plaintiff to the best of their ability and that he has not shown that they were deliberately indifferent to his serious medical needs. (Doc. 35 at 26-29; Doc. 44 at 3-7).

An Eighth Amendment violation occurs if prison personnel delay in renewing needed medication with the knowledge that the patient faces a substantial risk of harm if he does not receive his medication. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). However, Plaintiff must show that the delay resulted in substantial harm, meaning either "lifelong handicap, permanent loss, or considerable pain[,]" before he has established a constitutional violation. *Sealock*, 218 F.3d at 1210; *Garrett,* 254 F.3d at 950.

With regard to the Vistaril, the Court finds that a delay in the provision of allergy medication is not likely to result in "lifelong handicap, permanent loss, or considerable pain." The Eighth Amendment is concerned with the "unnecessary and wanton infliction of pain" and not "every twinge of pain suffered as the result of delay in medical care is actionable." *Sealock*, 218 F.3d at  1210. Similarly, the Court cannot say that a brief delay in receipt of Excedrin for Plaintiff's headaches resulted in the type of injury considered actionable under the Eighth Amendment. *See, e.g.*, *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 2000) (noting that "dizziness, sinus problems, headaches and a loss of energy are, objectively speaking relatively minor."); *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th

18

Cir. 2011) (nausea, shakes, and headaches not objectively serious medical conditions under the Eighth Amendment). This is particularly so when it appears Plaintiff was still being prescribed Tylenol at that time to treat his headaches. (*See* Doc. 35, Ex. A, Bates stamp at 31 (indicating that a 180 day supply of Tylenol was ordered for Plaintiff on January 10, 2011)). Perhaps most importantly, Plaintiff's claims must fail because he has not alleged that either Dr. Raschbaum or CMS were responsible for the delay in renewing the Vistaril or Excedrin at SNMCF. All Plaintiff has alleged is that the medications ran out and that a physician at SNMCF reordered them at some later date. (Doc. 39 at 20). He does not allege that Dr. Raschbaum was made aware of the delay nor that the delay was due to a custom or practice of CMS, as opposed to negligence or oversight on the part of medical personnel. This claim must fail.

Plaintiff's claims that his Neurontin was not reordered after his transfer to PNM in June of 2011 fails for similar reasons. Although Plaintiff has alleged that the delay in reordering the Neurontin resulted in seizures and significant injuries, he has not show that CMS or Dr. Shannon, the treating physician at PNM, were responsible for this delay. Plaintiff arrived at PNM on June 2 and his Neurontin anti-seizure prescription ran out on June 6. (Doc. 39 at 33; Doc. 39-2 at 21-22). He complained about his medications running out on June 7 and they were not renewed until he saw a nurse practitioner on June 13. (Doc. 39-2 at 14, 28). The prison's response to Plaintiff's grievance specifically stated that the gap in medical coverage was due to the transfer and stated that the medication had been reordered. (*Id.* at 14). Plaintiff's issue with regard to the Neurontin was resolved before he ever saw Dr. Shannon. (Doc. 35 at 19-20; Doc. 35, Ex. A, Bates stamp at 95 (showing that Plaintiff first saw Dr. Shannon at PNM on June 16)). Plaintiff's allegations

19

indicate negligence on the part of PNM's medical department for not realizing that his prescriptions were about to run out upon his transfer to PNM and not acting proactively to ensure that no gap in treatment ensued. While the delay regrettably resulted in several seizures, Plaintiff has not shown that those seizures were due to Dr. Shannon's deliberate indifference to Plaintiff's serious medical needs or that any policy of CMS was the primary moving force behind the occasional delays in receipt of his medication. The Court therefore recommends that summary judgment be granted on this claim.

### g.   Failure to Treat Infections

Plaintiff claims that injuries suffered during seizure episodes became infected and that Dr. Raschbaum at SNMCF failed to treat these infections properly. (Doc. 10 at 4). He identifies three infections which were not treated effectively: i) an infection which developed from a wound suffered during a seizure at PNM in October of 2010 but which was treated at SNMCF in January of 2010, ii) an infection in his foot after both of his large toenails came off, and iii) an infection which resulted from a seizure wound on his left arm in March of 2011. (Doc. 39 at 16, 19-21, 23, 27). Again, Defendants did not specifically address Plaintiff's allegations with regard to the infections except to state that Plaintiff was provided with appropriate medical care at all times. (Doc. 35 at 26-29; Doc. 44 at 3-7).

Despite Plaintiff's assertions, the medical records make clear that he did receive treatment for his various wounds and infections. The *Martinez Report* reflects that he received conservative treatment at PNM after injuring his shoulder during a seizure and that he received Bactrim, an antibiotic, following his arrival at SNMCF. (Doc. 35, Ex. A, Bates stamp at 15, 18; Doc. 39 at 16). With regard to his toenails, the record reflects that Plaintiff pulled off his own toenails with a pair of pliers and then complained that he thought

his legs were becoming infected. (Doc. 35, Ex. A, Bates stamp at 43). Nurses checked on the wound several times but found no infection, noting that the "nail bed [is] without redness, swelling, or discharge." (*Id.* at 44-46, 48-49). Plaintiff was provided with epsom salts, a tub for soaking his feet, and antibacterial ointment. (*Id.*). With regard to the arm wound suffered in March of 2011, the records reflect that he was prescribed ten day courses of Bactrim in both March and April to combat any infection. (Doc. 39 at 21; Doc. 35, Ex. A, Bates stamp at 51, 73). Plaintiff generally acknowledges that he received care for the infections, but argues that the antibiotics were not maintained for long enough to fully cure the infection and that his treatment was therefore deficient. (*See, e.g.*, Doc. 39-2 at 6 ("[Bactrim] ended after 10 days and before the infection was gone"); Doc. 39-2 at 24 ("Plaintiff's antibiotic (Bactrim) is always being discontinued before Plaintiff's staph infection is gone, and left to spread to other areas on Plaintiff's body.").

While Plaintiff may be dissatisfied with the quality of antibacterial care received at SNMCF, the medical records make clear that his wounds were treated. The medical records reflect that nurses checked on his wounds and that antibiotics were ordered when infections were discovered. Plaintiff has failed to show that any medical provider, much less Dr. Raschbaum, was deliberately indifferent to Plaintiff's medical needs with regard to his infectious wounds. *See, e.g.*, *Sanaah v. Howell*, 384 F. App'x 737, 741 (10th Cir. 2010) (Finding no deliberate indifference when a nurse cleaned and bandaged a prisoner's wound and provided him with Tylenol even though the wound later developed an infection); *Stepnay v. Goff*, 164 F. App'x 767, 770 (10th Cir. 2006) (indicating that a medical provider is not deliberately indifferent to prisoner's serious medical condition when prescribing a ten-day course of antibiotic treatment for an infection even if that treatment is not successful

at curing the condition). At best, he has alleged that the medical providers at SNMCF were negligent in failing to prescribe a longer regimen of Bactrim in order to fully cure Plaintiff's infections. As noted, negligent treatment by a prison doctor does not suffice to establish a claim of deliberate indifference under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The Court recommends that summary judgment be granted on this claim.

### h.   Cancellation of Pain Medication

Plaintiff contends that Dr. Shannon at PNM was deliberately indifferent to Plaintiff's serious medical needs when he cancelled Plaintiff's prescription for Ultram shortly before his transfer from PNM to NENMDF in April of 2011. (Doc. 10 at 4; Doc. 39-2 at 20, 22, 27). Ultram, also known as Tramadol, is a type of pain medication used to relieve moderate to severe pain.[5] When Plaintiff asked Dr. Shannon why he was discontinuing the Ultram, Dr. Shannon explained that "he had to in order to send Plaintiff to NENMDF per CMS policy." (Doc. 39-2 at 22). Upon his transfer to NENMDF, Plaintiff was told that Ultram was not an approved medication at NENMDF. (Doc. 35, Ex. A, Bates stamp at 80). Plaintiff claims that no substitute pain medication was offered at NENMDF. (Doc. 39 at 5).

Defendants do not directly address Plaintiff's argument with regard to Dr. Shannon's decision to discontinue the Ultram. Rather, they interpret Plaintiff's complaint as an attack on Dr. Shannon's care while Plaintiff was incarcerated at PNM and they note that Dr. Shannon provided Plaintiff with a variety of pain medications including Ultram, Excedrin, and Parafon Forte. (Doc. 44 at 4-5; Doc. 35, Ex A, Bates stamp at 87, 89, 95, 104, 106).

---

[5] *See* United States National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960. Ultram is used by people "who are expected to need medication to relieve pain around-the-clock for a long time." *Id.*

Dr. Shannon cancelled the Ultram because that medication was not allowed at NENMDF. In a similar case, the Tenth Circuit held that a doctor was not deliberately indifferent to an inmate's medical needs when failed to prescribe a medication which is no longer permitted at the relevant correctional facility. *Boles v. Dansdill*, 361 F. App'x 15,  18 (10th Cir. 2010) (Noting that doctor was not to fault for failing to prescribe Vasocon eye drops for patient's allergies because the Colorado Department of Corrections had recently banned the medication by placing it on the "non-formulary list."); *see also Collier v. Harter*, 2012 WL 1495366, at *11 (W.D.N.Y. Apr. 27, 2012) (No deliberate indifference found when doctor refused to prescribe a drug that was not approved for distribution at the correctional facility). If anything, Plaintiff's complaint is with the NENMDF staff as he alleges that he was not provided with a substitute for the Ultram - a claim that may be contradicted by the medical records.[6] Regardless, there is no suggestion that Dr. Shannon was involved in the decision to disallow the prescription of Ultram at NENMDF and his compliance with NENMDF's medication policy does not constitute deliberate indifference to Plaintiff's medical needs. *Id.* The Court therefore recommends that summary judgment be granted in Dr. Shannon's favor.

### i.    Placement in Segregation

Plaintiff's response to *Martinez Report* argues for the first time that Defendants violated his rights under the Fourteenth Amendment by placing him in segregation for over two years during his incarceration at various New Mexico correctional facilities. (Doc. 39

---

[6] Although somewhat unclear, the medical records indicate that Plaintiff was prescribed Pain Off at NENMDF. Pain Off is a pain medication combined of acetaminophen, aspiring, and caffeine. Plaintiff had five boxes of Pain Off on him when he was transferred back from NENMDF to PNM in June of 2011. (Doc. 35, Ex. A, Bates stamp at 82).

at 7; Doc. 39-2 at 30-31) (citing *Sandin v. Connor*, 515 U.S. 472 (1986)). He alleges that his continued placement in segregation exacerbated his post-traumatic stress disorder and caused both his mental and physical health to worsen. (*Id.*).

The Court construes Plaintiff's additional arguments as a motion to amend his complaint for the second time in order to include these new claims. District Courts are instructed to consider several factors when considering whether to grant a motion to amend a complaint. These factors include whether the amendment will result in undue prejudice, whether the proposed amendment was untimely, whether it was offered in good faith, and whether the party had sufficient opportunity to state the claim at an earlier time. *See, e.g.*, *Las Vegas Ice & Cold Storage v. Far West Bank*, 893 F.2d 1182, 1185 (10th Cir. 1990).

Although the Court cannot say that the proposed amendment was made in bad faith, the other three factors weigh against granting the motion. First, the Court finds that the proposed amendment is untimely.  This case has been proceeding for almost a year and Plaintiff has already filed a complaint and an amended complaint without ever mentioning any claims under the Fourteenth Amendment regarding his placement in segregation. Plaintiff did not alert the Court or Defendants to his Fourteenth Amendment claims until after the Court had already identified the claims raised by Plaintiff in his previous complaints and directed Defendants to produce a comprehensive *Martinez Report*. "[I]t is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, especially when the party filing the motion has no adequate explanation for the delay." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365-66 (10th Cir. 1993).

The Court also finds that Plaintiff had sufficient opportunity to raise his Fourteenth Amendment claims at an earlier time but that he failed to do so. Plaintiff knew about the

facts giving rise to his Fourteenth Amendment claim long before he filed his first complaint since he alleges that he has been held in segregation since at least 2010. (Doc. 39-2 at 30 (stating that, as of July 2012, he had been in segregation for more than two years)). Plaintiff provides no explanation why he waited until his response to the *Martinez Report* to raise these claims and the Tenth Circuit has cautioned that, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial." *State Distributors, Inc.*, *v. Glenmore Distilleries Co.*, 783 F.2d 405, 416 (10th Cir. 1984); *see also Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994) (stating that a district court "need not allow itself to be imposed upon by the presentation of theories in seriatim.").

Finally, the Court finds that allowing the proposed amendment at this stage of the litigation will prejudice Defendants. Allowing the amendment will likely require the submission of a new *Martinez Report* by Defendants. Plaintiff's Fourteenth Amendment claims could have been raised much earlier in the litigation, enabling Defendants to address those claims in the initial *Martinez Report* and thereby preserving both Defendants' and the Court's resources. For these reasons, the Court recommends that Plaintiff's new claims, which the Court construes as a motion to amend, be denied.

**IT IS THEREFORE RECOMMENDED** that *Defendant Correctional Medical Services, William Shannon, M.D., Leopold Raschbaum, M.D., and Bud E. Faris, D.O.'s Martinez Report*, (Doc. 35), which the Court construes as a motion for summary judgment, be **GRANTED** with respect to all of Plaintiff's Eighth Amendment claims.

25

**IT IS FURTHER RECOMMENDED** that Plaintiff's Fourteenth Amendment claims relating to his placement in segregation, which the Court construes as a motion to amend the complaint, **BE DENIED**.

**IT IS FURTHER RECOMMENDED** that Plaintiff's amended *Civil Rights Complaint*, (Doc. 10), be **DISMISSED WITH PREJUDICE**.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE